RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0423p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

v.                                                    No. 08-5703

DERRICK ARCHIBALD,
                    *Defendant-Appellant.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 07-00073-001—Robert L. Echols, District Judge.

Argued: October 14, 2009

Decided and Filed: December 15, 2009

Before: BATCHELDER, Chief Judge; GRIFFIN, Circuit Judge; TARNOW, District
Judge.[*]

_____

**COUNSEL**

**ARGUED:** Anne-Marie Moyes, FEDERAL PUBLIC DEFENDER'S OFFICE,
Nashville, Tennessee, for Appellant. Heather G. Childs, ASSISTANT UNITED
STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Anne-Marie
Moyes, Mariah A. Wooten, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville,
Tennessee, for Appellant. Kelly D. Young, ASSISTANT UNITED STATES
ATTORNEY, Nashville, Tennessee, for Appellee.

       GRIFFIN, J., delivered the opinion of the court, in which TARNOW, D.J.,
joined. BATCHELDER, C.J. (pp. 19-20), concurred and wrote separately.

_____

[*] The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of
Michigan, sitting by designation.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.  Defendant Derrick Archibald appeals his conviction for unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), arguing the district court erred in failing to suppress the firearm evidence obtained during a search of his residence conducted pursuant to a state search warrant. Archibald contends that the protective sweep, which provided probable cause for the search warrant and led to the discovery and seizure of the firearm, violated his Fourth Amendment rights.  Because the district court erred by holding that the protective sweep of Archibald's apartment comported with the Fourth Amendment, we reverse the district court's order denying Archibald's motion to suppress and remand for further proceedings consistent with this opinion.

I.

On April 29, 2006, four Metropolitan Nashville police officers went to Archibald's residence  to serve him with two state arrest warrants for probation violations.  Sergeant Brent Fidler, a Supervisor in the Crime Suppression Unit of the Metropolitan Nashville Davidson County Police Department, and Sergeant Robert Nielsen, who patrolled the area in which Archibald resided, were two of the four officers who participated in the arrest.[1]  The officers' sworn testimony was the only evidence presented during the evidentiary hearing on the motion to suppress and was credited by the district court.

Fidler testified that before serving the warrants, he checked with the Warrants Division to confirm that the warrants were valid and also verified through utility records that Archibald resided at the target address.  As was his custom, Fidler also reviewed Archibald's criminal history and conducted a Risk Analysis Threat Assessment.  The

———————————

[1]Nielsen was an officer during the relevant time period, but has since been promoted to sergeant.

check revealed that Archibald had previously been charged with attempted homicide, resisting arrest, evading arrest, assault, drug offenses, and a weapons offense.**2** Archibald received a Risk Analysis Threat Assessment score in the "teens" and was considered a "higher risk."

At approximately 7:00 p.m., Fidler, Nielsen, and two other officers, Fox and Draves, arrived at Archibald's residence, an apartment with a small porch. Fidler and another officer inspected the back side of the building and determined the front door was the only point of entry. Thereafter, they returned to the front of the apartment where Nielsen stepped onto the porch and began knocking on the front door. Fidler and the other two officers positioned themselves approximately eight feet off the porch and to the side of the front door, covering Nielsen.**3**

Nielsen knocked on the door repeatedly and heard movement inside the residence; however, no one came to the door or gave a verbal response. Only Nielsen was standing close enough to the door to hear movement, which he described to his colleagues. Fidler testified that Nielsen stated: (1) "I can hear *him*. I can hear *someone* moving around inside"; (2) "there was *someone* moving around inside"; and (3) "I can hear *somebody* moving around." (Emphasis added.)

Similarly, Nielsen testified that he "assumed [the movement he heard] was *somebody* coming to the door." (Emphasis added.) After approximately three to five minutes of additional knocking, Nielsen heard "a male voice" behind the door say "[w]ho is it?" Nielsen identified himself as a police officer and requested that Archibald "come to the door." There was no response to this request, but Nielsen heard "more shuffling sounds" from inside. "This went on for probably another maybe roughly five minutes. [He] heard some shuffling sounds. Then it would get quiet. And then there

---

**2**Nielsen also ran Archibald's criminal history and believed from his review that Archibald had been convicted of attempted homicide, rather than merely being charged with the crime.

**3**The officers testified that doorways present greater safety risks and are termed "fatal funnel[s]" because they allow for increased vulnerability to attack.

were more shuffling sounds." Nielsen stated that his "primary concern was that *whoever* was in there either has a weapon or may have a weapon." (Emphasis added.)

Regarding the possibility of more than one person being in the apartment, Nielsen testified:

Q:    [Government's attorney] And from all of the sounds you were hearing, could you ascertain how many people were in the apartment?

A:    [Nielsen] No, ma'am. I could not.

Q:    What were your thoughts about potential there?

A:    Possibly two.

On cross-examination, Nielsen clarified his testimony as follows:

Q:    [Defendant's attorney] And you only heard one voice; is that correct?

A:    [Nielsen] Yes, ma'am. That is correct.

Q:    And you didn't see or hear anything that let you know or think that there were multiple people in the apartment. Isn't that correct?

A:    No. Not necessarily. Because when we heard shuffling movement and only one voice, that's not definitive with a closed door and a closed window for how many people are in there.

Q:    Okay.

A.    The minimum assumption is one person. *We always assume there could be — not necessarily are, but could be others.*

Q:    But in truth of fact, you didn't know how many people were in the apartment.

A:    No, ma'am. I didn't.

Q:    You didn't know if anyone else was in the apartment with Mr. Archibald.

A:    Yes, ma'am. That's correct.

Q:    And you had no facts upon which to base a thought that there was, in fact, someone else in there. You just suspected it could be someone else in there. Is that correct?

> A:     Based on the totality of what we encountered at the door, plus his criminal history and things of that nature. *We always assume that there could be*, whenever we're serving a warrant, for officer safety.

(Emphasis added.)

Archibald eventually opened the door; when he did so, a total of approximately ten minutes had passed from the time Nielsen first started knocking. As the district court described it:

> [The] next events happened almost instantly. When Defendant opened the door, Officer Nielson [sic] stepped slightly into the apartment, grabbed the Defendant, and took a quick glimpse inside. The remaining officers jumped up on the porch as Officer Nielson [sic] was pulling Defendant out of the doorway and off the porch.
>
> During the moment he was inside, Officer Nielson [sic] could see there was a living room area to the left of the entry door which was separated from the adjoining kitchen by a solid bar counter which obscured the view into the kitchen. Immediately behind the door was a staircase which led to an upstairs bedroom loft. Likewise, when Sergeant Fidler jumped onto the porch as Defendant was being pulled out of the apartment, he saw the obstructing bar counter separating the kitchen from the living room, as well as a stairway behind the door leading to an upstairs bedroom loft with a privacy wall which blocked any direct view into the bedroom. . . .
>
> Officer Nielson [sic] and one of the other officers remained with the Defendant just off the porch and placed him in handcuffs. Sergeant Fidler and the remaining officer entered the apartment quickly . . . . [and] conducted a short protective sweep[.]

During his protective sweep, Fidler discovered in the kitchen, in plain view, "a plate with white powder residue all over it, as well as a plastic insurance card with powder residue on it, and a small tubular device with powder residue on it." Fidler recognized these items as "narcotic contraband." After searching downstairs, the officers completed a protective sweep upstairs for other persons on the premises. No one else was found in the apartment, and no further incriminating evidence was discovered.

Because Fidler observed a substance that appeared to be cocaine,[4] he and the other officers secured the premises, obtained a search warrant, and returned to Archibald's apartment to conduct a search.  During the ensuing search of Archibald's apartment, the officers found the firearm which served as the basis for the federal charge of felon in possession.

Archibald moved to suppress the firearm evidence, arguing that the officers lacked reasonable suspicion to believe that another person was present in his residence who may attack them, and, accordingly, the warrantless protective sweep was unconstitutional and the evidence flowing therefrom must be suppressed.  Following the evidentiary hearing, the district court denied Archibald's motion on the grounds that:

> the officers in this case articulate[d] specific facts for their reasonable belief that someone else besides the Defendant may have been in the apartment where the arrest warrant was executed, their recognition of Officer Nielson's [sic] vulnerability, the potential harm to the officers, the speedy and limited protective sweep search, and the totality of the circumstances[.]

Archibald subsequently entered a guilty plea to the charge of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), reserving his right to appeal the denial of his suppression motion.  Defendant timely appeals.

## II.

The grant or denial of a motion to suppress is a mixed question of law and fact. *United States v. Ellis*, 497 F.3d 606, 611 (6th Cir. 2007).  "On appeal, we review the district court's findings of fact for clear error and its conclusions of law de novo." *Id.* When reviewing a district court's denial of a motion to suppress on the law, we consider the evidence in the light most favorable to the government. *United States v. Smith*, 549 F.3d 355, 359 (6th Cir. 2008) (citing *United States v. Montgomery*, 377 F.3d 582 (6th Cir. 2004)).

---

[4]The officers field tested the substance they found on the counter to confirm it was cocaine.

III.

The Fourth Amendment guarantees the right of liberty against unreasonable searches and seizures by providing:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

In *United States v. United States District Court*, 407 U.S. 297, 316, 318 (1972), the Supreme Court emphasized the following core requirements of the Fourth Amendment:

> [T]he very heart of the Fourth Amendment directive [is]:  that, where practical, a governmental search and seizure should represent both the efforts of the officer to gather evidence of wrongful acts and the judgment of the magistrate that the collected evidence is sufficient to justify invasion of a citizen's private premises or conversation.  Inherent in the concept of a warrant is its issuance by a "neutral and detached magistrate."  *Coolidge v. New Hampshire*, [403 U.S. 443, 453 (1971)]; *Katz v. United States*, [389 U.S. 347, 356 (1967)].   The further requirement of "probable cause" instructs the magistrate that baseless searches shall not proceed.
>
> * * *
>
> [T]here have been some exceptions to the warrant requirement.  *Chimel v. California*, 395 U.S. 752 (1969); *Terry v. Ohio*, 392 U.S. 1 (1968); *McDonald v. United States*, 335 U.S. 451 (1948); *Carroll v. United States*, 267 U.S. 132 (1925).  But those exceptions are few in number and carefully delineated, *Katz*, *supra*, 389 U.S., at 357; in general, they serve the legitimate needs of law enforcement officers to protect their own well-being and preserve evidence from destruction.  Even while carving out those exceptions, the Court has reaffirmed the principle that the "police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure," *Terry v. Ohio, supra*, 392 U.S., at 20; *Chimel v. California*, *supra*, 395 U.S., at 762.

The established warrant exceptions at issue in the present case were articulated by the Supreme Court in *Maryland v. Buie*, 494 U.S. 325 (1990).  In *Buie*, the Court held that when executing an arrest, police may:

> as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Id.* at 334.

It is well-settled that arrest warrants are not search warrants.  *Steagald v. United States*, 451 U.S. 204, 212-13 (1981).  Thus, the Supreme Court has identified two types of warrantless protective sweeps of a residence that are constitutionally permissible immediately following an arrest.  The first type allows officers to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."  *Buie*, 494 U.S. at 334.  The second type of sweep goes "beyond" immediately adjoining areas but is confined to "such a protective sweep, aimed at protecting the arresting officers[.]"  *Id*. at 334-35.  The first type of sweep requires no probable cause or reasonable suspicion, while the second requires "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  *Id.* at 334.  The Supreme Court also "emphasize[d]" that this second kind of sweep is "not a full search of the premises," but "extend[s] only to a cursory inspection of those spaces where a person may be found" and should  last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises."  *Id.* at 335-36.

IV.

On appeal, the government contends that the challenged protective sweep occurred incident to an in-house arrest and involved an area immediately adjoining the place of Archibald's arrest.  Therefore, the government asks the court to uphold the protective sweep under the first and less stringent *Buie* test.  The government, however, failed to present this argument to the district court.  Instead, the government chose to argue only that the protective sweep was valid under the second *Buie* category of sweep, which requires "articulable facts" supporting the presence of another person who might pose a potential danger to the arresting officers.[5]  The government faults Archibald for not arguing in the district court that the protective sweep was unlawful under the first *Buie* test, but the government, not Archibald, had the burden to prove the constitutionality of the warrantless search of Archibald's residence.  *United States v. Akrawi*, 920 F.2d 418, 421 (6th Cir. 1990).

Moreover, as an appellate court, we do not ordinarily consider issues that are not raised in the district court.  *Smoot v. United Transp. Union*, 246 F.3d 633, 648 n.7 (6th Cir. 2001) (citing *Hormel v. Helvering*, 312 U.S. 552, 556 (1941)).  "'The purpose behind the waiver rule is to force the parties to marshal all of the relevant facts and issues before the district court, the tribunal authorized to make findings of fact.'"  *Id.* (quoting *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 325 (6th Cir. 1999)).  "Logically, this principle is applied to bar both the government and a defendant from raising Fourth Amendment arguments for the first time on appeal."  *United States v. Abdi*, 463 F.3d 547, 564 (6th Cir. 2006) (Cole, J., dissenting).  *See United States v. Alvarez-Sanchez*, 511 U.S. 350, 360 n.5 (1994) ("Finding no exceptional circumstances that would warrant reviewing a claim that was waived below, we adhere to our general practice and decline to address respondent's Fourth Amendment

---

[5] On appeal, Archibald argues that while the district court did not make an explicit factual finding regarding the location of the arrest, it did make "implicit factual conclusions" that either (1) the arrest was accomplished outside of Archibald's residence, or (2) that the sweep of Archibald's residence extended beyond the scope permitted under the first *Buie* test.  Defendant contends that this court should apply the clear error standard of review to what he perceives as the district court's implicit factual findings.  We decline to apply the clear error standard to unstated facts, but rather find that the government failed to preserve this issue or, alternatively, that this theory fails on the merits.

argument."); *Steagald*, 451 U.S. at 208-09 (1981) (government argued in district court that exigent circumstances and consent justified warrantless search of residence, but additional issue on appeal that petitioner had no expectation of privacy in residence was waived); *Giordenello v. United States*, 357 U.S. 480, 488 (1958) ("We do not think that these belated contentions are open to the Government in this Court and accordingly we have no occasion to consider their soundness.").

Because the government chose not to raise the issue in the trial court, the district judge did not make factual findings regarding whether the protective sweep occurred incident to an in-house arrest and within the area immediately adjoining the place of arrest. As the Supreme Court stated in *Giordenello*, "[t]o permit the Government to inject its new theory into the case at this stage would unfairly deprive [defendant] of an adequate opportunity to respond." 357 U.S. at 488. We therefore hold that the government failed to preserve on appeal consideration of the protective sweep under the first *Buie* test. Moreover, we decline to remand this case to the district court for further proceedings and findings on the government's new theory because "[t]he facts on which the Government now relies to uphold the [protective sweep] were fully known to it at the time of [the suppression hearing], and there are no special circumstances suggesting such an exceptional course." *Id.*

V.

Additionally, we note that even if the government had preserved this issue, its theory that the protective sweep occurred incident to an in-house arrest and involved an area immediately adjoining the place of Archibald's arrest fails on its merits.[6] In its decision, the district court indicated that "Officer Nielson [sic] stepped slightly into the

---

[6]In *Vale v. Louisiana*, 399 U.S. 30 (1970), the Supreme Court held that:

A search may be incident to an arrest "only if it is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest." If a search of a house is to be upheld as incident to an arrest, that arrest must take place inside the house, not somewhere outside – whether two blocks away, twenty feet away, or on the sidewalk near the front steps.

*Id.* at 33-34 (internal citations omitted).

apartment, grabbed the Defendant, and took a quick glimpse inside." Nielsen also initially testified that Archibald was "taken into custody . . . [j]ust inside the threshold of the door." However, under cross-examination, Nielsen altered his testimony as follows:

> Q:     [Defendant's attorney] So, it's your testimony, if I understand it, that you and another officer arrested him, placed him under arrest.
>
> A:     [Nielsen] Well, I put hands on him and then pulled him outside to handcuff him. Yes, ma'am.
>
> Q:     You pulled him outside?
>
> A:     Right. At that time the other officer had come up to assist me in handcuffing Mr. Archibald and moving him out of the doorway.
>
> Q:     Just for clarity, you didn't push him back in and go inside, did you?
>
> A:     No.
>
> Q:     Because you were in the fatal funnel; is that right?
>
> A:     Yes.
>
> Q:     It wouldn't make sense that an officer would have a suspect at a door and they would go into the apartment?
>
> A:     No.
>
> Q:     So you pulled him outside and placed him under arrest at that time.
>
> A:     Yes, ma'am.

At most, it appears that Nielsen stepped into the threshold of the door to initiate the arrest by grabbing Archibald. The arrest was then completed outside the residence where Archibald was handcuffed and patted down. As Archibald notes, "[a] number of courts have categorized this very sort of doorstep, front porch, doorway, or threshold arrest as an outside – not inside – arrest under the *Buie* analysis and have thus required that the protective sweep be justified by an officer's reasonable belief in the presence of a dangerous third party." *See, e.g.*, *United States v. Kinney*, 638 F.2d 941, 943, 945 n.2 (6th Cir. 1981) (where an officer grabbed the defendant's arm after he opened the front

door, pulled him out of the apartment onto the porch and handcuffed him while on the porch, the record "uncontrovertably demonstrate[d] that the arrest was accomplished on the porch outside of the dwelling"); *United States v. Henry*, 48 F.3d 1282, 1284 (D.C. Cir. 1995) (where arrest accomplished "just outside the open door" of defendant's apartment); *United States v. Watson*, 273 F.3d 599, 601, 603 (5th Cir. 2001) (where defendant "was 'coming toward the front door of the house from the inside of the house' at the time of arrest[,]" and was "arrest[ed] on the front porch"); *United States v. Oguns*, 921 F.2d 442, 445-46 (2d Cir. 1990) (where officers arrested defendant at gunpoint "just outside of his apartment"); *United States v. Wilson*, 306 F.3d 231, 234, 237-38 (5th Cir. 2002), *overruled on other grounds by United States v. Gould*, 364 F.3d 578, 586 (5th Cir. 2004) (where defendant was arrested several feet from front door wearing only his boxer shorts); *United States v. McLemore*, No. 05-CR-266, 2006 WL 572353, at *8 (E.D. Wis. March 7, 2006) ("To be sure, an arrest made in the doorway of an apartment is 'just outside the home'" and must be analyzed under second *Buie* test.).

In its response brief, the government cites one unpublished case from the Third Circuit, *United States v. Latz*, 162 F. App'x 113, 116, 118-19 (3d Cir. 2005) (unpublished), and a published case from the D.C. Circuit, *United States v. Thomas,* 429 F.3d 282, 287 (D.C. Cir. 2005), to support its argument that a limited protective sweep of the immediate area inside the front door of a residence is allowed, under the first *Buie* test, when an arrest is initiated in the doorway of a residence.  Neither case, however, is binding on this court and each is distinguishable from the facts present in this case.  In *Latz*, the defendant opened the door to his residence in response to an officer knocking, was seized by the arm, and was taken down on the front porch and handcuffed.  162 F. App'x at 115-16.  Unlike the present case, however, while Latz was restrained on the front porch, an officer stepped just inside the doorway, looked to the left, and *immediately* observed two weapons in plain view and the defendant's roommate descending the stairs.  *Id.* at 116.  In the instant case, the officers did not see any other individuals, weapons, or other contraband when they looked inside the doorway of Archibald's apartment.  In *Thomas*, the defendant was apprehended in the hallway inside the front door of his residence and handcuffed in his living room.  429 F.3d at 287.

Here, Archibald was apprehended on his doorstep and handcuffed outside of his residence. *Thomas*, therefore, is clearly distinguishable from the present case.

The protective sweep also did not occur within the area immediately adjoining the place of arrest. In *Buie*, the Supreme Court indicated that "as a precautionary matter and without probable cause or reasonable suspicion" officers may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." 494 U.S. at 334. The Supreme Court cautioned, however, that such sweeps do not amount to "a full search of the premises[.]" *Id*. at 335. Here, the officers swept not just the room "immediately adjoining" the doorway, i.e., the living room, but also the kitchen and upstairs bedroom. Indeed, by extending the scope of the protective sweep, the officers ran the risk of exposing themselves to more danger. *See id.* at 338 (Stevens, J., concurring) (questioning officer's decision to expose himself to greater risk by entering the basement rather than just looking in open basement door, confirming that no one was on the steps, and then shutting and guarding the door). Unlike the situation in *Latz*, there was no indication from viewing the area immediately adjoining the place of arrest (i.e., the living room) that an attack could be immediately launched. Accordingly, we conclude that the government's position under the first *Buie* standard lacks merit even if this issue were preserved. Thus, a remand regarding this unpreserved issue would be a futile exercise.

## VI.

Given our holding that the government failed to preserve consideration of the protective sweep under the first *Buie* test, the warrantless search of Archibald's apartment was constitutional only if the officers satisfied the second *Buie* standard by possessing "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be

swept harbors an individual posing a danger to those on the arrest scene."**7** *Buie*, 494 U.S. at 334.

On appeal, the United States argues that the officers had the requisite articulable facts supporting *Buie*'s second type of sweep because: (1) of defendant's prior arrests for violent crimes; (2) the "particular vulnerability" of the officers; (3) Archibald's delay in responding to the knocking and announcement by Nielsen; (4) "noises from inside defendant's residence"; and (5) Archibald's arrest and the protective sweep occurred simultaneously.

### A.

Regarding the government's first justification, in *United States v. Colbert*, 76 F.3d 773, 777 (6th Cir. 1996), we held that a defendant's own dangerousness is not relevant in "determining whether the arresting officers reasonably believed that *someone else inside the house* might pose a danger to them[,]" as those facts reflected only the dangerousness of the arrested individual, not others.**8** Thus, Archibald's prior arrests for violent crimes were an "irrelevant" factor, which the district court should not have considered. *Id.* The government does cite three different cases for the proposition that, "with respect to the potential existence of assailants other than an arrested defendant, reviewing courts have found that reasonable possibilities that such persons are present and dangerous, as opposed to direct evidence, may justify protective sweeps." *See United States v. Biggs*, 70 F.3d 913, 916 (6th Cir. 1995) (approving sweep based on several factors, including (1) police had received information that another person would be meeting the defendant at his motel room, and (2) the defendant had previously been arrested on two separate occasions, in the presence of someone with a firearm); *United*

---

**7**Because the government did not argue below (in its response to the motion to suppress), and does not argue in its appellate brief, that the protective sweep was justified in order to prevent the destruction of evidence, this issue is forfeited and we need only focus on the *Buie* analysis. *See Smoot,* 246 F.3d at 648 n.7; *Fitts v. Sicker*, 232 F. App'x 436, 442 (6th Cir. 2007) ("issues not raised in appellate briefs are deemed waived") (citing *Ahlers v. Schebil*, 188 F.3d 365, 374 (6th Cir. 1999).

**8**As was the case in *Colbert*, here Archibald was already outside of the apartment when the sweep began, albeit within seconds of the sweep beginning. *See Henry*, 48 F.3d at 1284 (explaining that the threat posed by an individual already in custody does not justify a protective sweep).

*States v. Atchley*, 474 F.3d 840, 844, 849-50 (6th Cir. 2007) (approving sweep of a motel room where police had received a tip that several individuals were manufacturing methamphetamine in the room, two of the defendant's companions had just escaped during a confrontation with police in the motel parking lot and may have reentered the room, and from outside the room police observed a handgun on the bed); and *United States v. Beasley*, 199 F. App'x 418, 423 (6th Cir. 2006) (unpublished) (approving sweep of motel room where the defendant was arrested in parking lot in possession of drugs and a firearm and officers saw another person looking out motel room window into parking lot). Yet, in all three of the cited cases, the officers had strong circumstantial evidence that potentially dangerous criminal accomplices might be present. Here, the record contains no evidence, circumstantial or otherwise, of the presence of a dangerous third party in Archibald's residence. Moreover, the two arrest warrants issued for Archibald were for probation violations, which neither party asserts involved accomplices, and therefore did not raise concerns that an accomplice might be present in Archibald's apartment at the time of his arrest.

B.

Similarly, the officers' perceived vulnerability in the "fatal funnel" (i.e., the doorway of Archibald's residence), and the officers' inability to see behind the half-wall counter in the kitchen or in the upstairs bedroom loft, do not demonstrate a specific and reasonable belief that another person was present in Archibald's apartment and posed a danger. *See United States v. Ford*, 56 F.3d 265, 269 n.6 (D.C. Cir. 1995) (noting that "[p]oor lighting . . . [has] nothing to do with a belief that the area harbors 'an individual posing a danger to those in the arrest scene.'") (quoting *Buie*, 494 U.S. at 334). In order to justify the protective sweep, the government bore the burden of providing sufficient facts to the district court to support a reasonable belief that a third party was present in Archibald's home who "pos[ed] a danger to those on the arrest scene." *Buie*, 494 U.S. at 334. That burden is not reduced because the officers were unable to view the entire residence or because they felt "particularly vulnerable" based solely on their location. In fact, if, as the officers testified, entry into a "fatal funnel" poses a greater risk to law

enforcement, the prudent course of action would have been to back away from the door, not proceed through it.

C.

Next, the government argues that Archibald's delayed response to Nielsen's knocking and the shuffling sounds Nielsen heard inside Archibald's residence created a reasonable belief that someone else was inside the residence that posed a threat to the officers.[9] Yet, at the time of the arrest, Nielsen, the only officer close enough to the door to hear sounds, indicated to his fellow officers that he only heard one individual inside. He stated: "I can hear *him*.  I can hear *someone* moving around inside."  (Emphasis added.)  Later, at the suppression hearing, Nielsen indicated that the sounds may have been caused by "[p]ossibly two" individuals, but he was only able to support this contention by stating, "[t]he minimum assumption is one person.  We *always* assume there could be — not necessarily are, but could be others."  (Emphasis added.)

D.

Clearly, *Buie* requires more than ignorance or a constant assumption that more than one person is present in a residence.[10]  In *Colbert*, we stated that a lack of knowledge as to whether others were in a home necessarily failed the *Buie* standard because that standard requires "articulable facts," not ignorance:

> In fact, allowing the police to conduct protective sweeps whenever they do not know whether anyone else is inside a home creates an incentive for the police to stay ignorant as to whether or not anyone else is inside a house in order to conduct a protective sweep.  Finally, and perhaps

---

[9]Both Fidler and Nielsen testified that there is nothing in either of their reports, prepared following the arrest, regarding "any noise" or "rustling."  These sounds appear to be mentioned by the officers for the first time during the suppression hearing conducted to examine the justification behind the protective sweep.

[10]On an analogous issue, we note the Supreme Court's recent decision in *Arizona v. Gant*, 129 S. Ct. 1710, 1721 (2009), in which the Court rejected a broad reading of *New York v. Belton*, 453 U.S. 454 (1981), as "unnecessary to protect law enforcement safety and evidentiary interests."  In his concurrence, Justice Scalia stated that "[i]t is abundantly clear that [traditional standards of reasonableness] do not justify what I take to be the rule set forth in *New York v. Belton* . . . and *Thorton* [*v. United States,* 541 U.S. 615 (2004)]: that arresting officers may always search an arrestee's vehicle in order to protect themselves from hidden weapons."  *Gant*, 129 S. Ct. at 1724 (Scalia, J., concurring).

> most importantly, allowing the police to justify a protective sweep on the ground that they had no information at all is directly contrary to the Supreme Court's explicit command in *Buie* that the police have an articulable basis on which to support their reasonable suspicion of danger from inside the home. "No information" cannot be an articulable basis for a sweep that requires information to justify it in the first place.

*Colbert*, 76 F.3d at 778. Accordingly, cases that have found that noises emanating from a residence supported a reasonable belief in the presence of other individuals have required contributing facts or stronger evidence than what is presented here supporting the officers' suspicions that more than one person was present. *See, e.g., United States v. Talley*, 275 F.3d 560, 562 (6th Cir. 2001) ("officers heard a loud commotion and the sounds of several individuals running throughout the apartment and up and down the stairs"); *United States v. Stover*, 474 F.3d 904, 910-12 (6th Cir. 2007) (officers observed two cars parked in driveway of duplex – one registered to defendant and the other to a "local criminal" who resided at a different address – and heard noise and movement in house before defendant came downstairs); *United States v. Taylor*, 248 F.3d 506, 511, 514 (6th Cir. 2001) (holding that protective sweep was justified where officers obtained consent from defendant's brother to enter defendant's apartment, heard shuffling noises indicating the presence of multiple persons, had information that defendant was a drug and weapons dealer suspected of numerous murders, saw a marijuana stem in plain view, and observed defendant's brother behaving nervously).[11]

---

[11]The government relied heavily on *Taylor* in presenting its case to the district court. However, the district court ruled that *Taylor* was not dispositive and turned to *Buie* for guidance.

Moreover, in *Taylor*, but not in this case, defendant's brother opened the door and allowed the officers to enter the apartment. *Taylor*, 248 F.3d at 511. Only after receiving permission to enter the apartment, discovering marijuana in plain view on the coffee table, and observing Taylor's nervous brother did the officers decide they would secure the residence and obtain a search warrant. *Id.* The officers then conducted a cursory search of the premises for people who may threaten their safety while they waited for the search warrant and found defendant hiding fully clothed in a bathtub. *Id.* *Taylor* is therefore distinguishable from the instant case because of the incriminating evidence and additional factors found in *Taylor* but not here, as well as, and perhaps more importantly, the need for the officers to protect themselves while they remained inside the residence awaiting a search warrant.

E.

Finally, because the government fails to develop in any meaningful way in its appellate brief how the closeness of the sweep to the time of Archibald's arrest demonstrates, alone or in conjunction with other facts, the presence of another individual in Archibald's residence, we consider this issue to be forfeited.[12] *See United States v. Phinazee*, 515 F.3d 511, 520 (6th Cir. 2008) ("issues adverted to on appeal in a perfunctory manner unaccompanied by some effort at developed argument are deemed waived[.]") (internal citation and quotation marks omitted).

VII.

The Fourth Amendment guarantee of liberty against unreasonable searches and seizures requires warrants, based upon probable cause, describing with particularity the place to be searched, and the persons and things to be seized. The warrantless search at issue satisfies neither the textual directives of the Fourth Amendment nor the sole, preserved, judicially-created exception – the second *Buie* protective sweep test.

We hold that, based on this record, the government failed to meet its burden of demonstrating "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334. Therefore, we reverse the order and judgment of the district court and remand for further proceedings consistent with this opinion.

---

[12]Similarly, the good faith exception to the exclusionary rule, as recognized by the Supreme Court in *Herring v. United States,* 129 S. Ct. 695, 701 (2009), and *United States v. Leon*, 468 U.S. 897, 906 (1984), has not been raised, preserved, or argued by the government. For this reason, we do not address it.

———————————————

**CONCURRENCE**

———————————————

ALICE M. BATCHELDER, Chief Judge, concurring.  I concur in the lead opinion.  I write separately to note — with regard to the lead opinion's discussion of Officer Fidler's testimony describing Officer Nielsen's verbal observations at the scene — that we need to be cautious about the weight we ascribe to an officer's on-the-spot use of singular pronouns.  The fact that while waiting for someone in Archibald's residence to answer the door, Officer Nielsen told his fellow officers that he could "hear him," and that he could hear "someone moving around inside," is hardly, in my view, evidence from which we could or should conclude that Officer Nielsen heard, or believed he heard, only one individual inside the residence.  Surely that word usage would not suffice to counter other evidence in the record supporting an officer's suspicion that more than one person was inside.  And surely, if Officer Nielsen had instead said he could "hear *them* moving around inside," we would not say that this pronoun choice sufficed to counter other evidence in the record that would have led a reasonable officer to believe that only one person was inside the residence.  What is important here is that, other than the significant delay before Archibald opened the door, the officers had virtually *no* evidence to support any suspicion that more than one person was in the residence.

Nor should the lead opinion be read to stand for the proposition that there is an invisible impenetrable threshold at the door of a home, such that if an arrest occurs slightly inside or slightly outside that threshold, the entire legal analysis fundamentally changes.  Instead, the test remains that "during a search incident to an arrest occurring inside a home, officers may, 'as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.'"  *United States v. Colbert,* 76 F. 3d 773, 776 (6th Cir. 1996) (quoting *Maryland v. Buie,* 494 U.S. 325, 334 (1990)).  Because the government waived analysis under this first *Buie* test, we analyzed

the facts under the second *Buie* test, under which officers may conduct a more extensive search only when they have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie,* at 334. We do not address whether Archibald was arrested outside or inside his home. Rather, we are simply conducting an analysis of whether, under the facts of the case, the second *Buie* test was met. And in this case, it was not.