NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0280n.06

**No. 20-5949**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

DEANGELO VANHOOK,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

**FILED**
Jun 08, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF TENNESSEE

BEFORE: SUTTON, Chief Judge; DAUGHTREY and GRIFFIN, Circuit Judges

GRIFFIN, Circuit Judge.

Defendant DeAngelo Vanhook appeals the district court's denial of his motion to suppress evidence. The critical question in this appeal is whether a police officer exceeded the scope of a protective sweep when he inspected the space under a couch in a room that adjoined the place of defendant's arrest. Because there were articulable facts—and reasonable inferences from those facts—that justified a reasonably prudent officer's belief that the couch could have been concealing a person, the inspection under the couch did not exceed the bounds of the protective sweep. Accordingly, we affirm the district court's denial of defendant's suppression motion.

I.

On February 6, 2019, members of the Shelby County Sheriff's Office Fugitive Apprehension Team were looking for Vanhook because they suspected he had committed a possible homicide. {R. 32, PageID 63–64.} The detectives had received information that

(1) Vanhook might have been at his grandparents' house and (2) that Vanhook was with the other homicide suspect. {R. 32, Page ID 64–65.}

A group of detectives, including Detective Joshua Fox, went to defendant's grandparents' house. {R. 32, PageID 68.} The homeowner gave consent for the officers to enter the premises and search for both homicide suspects. {R. 35, PageID 195.} After the officers entered the living room, defendant exited an adjoining bedroom. {R. 35, PageID 195.} They arrested Vanhook and Detective Fox "stepped into the bedroom to make sure it was clear and there was nobody else in there[;] [he was] looking for the other person that [they had] received information [about] that might be with [Vanhook]." {R. 32, PageID 72.}

While Detective Fox was scanning the unlit room with his flashlight, he noticed a jar that contained marijuana and money. {R. 35, PageID 196.} The detective then "kneeled down to look underneath the couch, because [he had] had people hide in couches, underneath couches, [and] behind couches." {R. 32, PageID 72.} In fact, he noted, "In my past experience, we've had people where they've gutted couches and they will lay inside that couch and their body will actually touch the floor." {R. 32, PageID 93.} As he was looking under the couch, Detective Fox saw an AR-15 style rifle. {R. 35, PageID 196.} The detective did not need to move anything to see the rifle. {R. 35, PageID 196.} The officers did not seize the drugs or the gun at that time; instead, they secured the room and applied for a search warrant. {R. 35, PageID 196.} Detective Samuel Crews—who was also at the scene—prepared an affidavit to support the application for a search warrant. {R. 35, PageID 196.} The following is the affidavit in its entirety:

> On January 25, 2019, SCSO Deputies located a decomposed male in the wood line near the intersection of McWhirter and Creekstone. The remains were identified by the West TN Forensics Center as Dontello Kelly who had been reported missing since on or about November 6, 2018. The last known individual to have contact with Donatello Kelly is Deangelo Vanhook . . . who has outstanding warrant for Disorderly Conduct and Criminal Trespass. SCSO Deputies with the Fugitive

Apprehension Team located Vanhook at 3447 Scenic Highway shortly after 06:40 hours on February 6, 2019. John L Hood, the homeowner at 3447 Scenic Hwy is the grandfather of Deangelo Vanhook. As SCSO Fugitive knocked and were invited into the residence, a glass jar of narcotics and an AR style rifle was observed in plain view, which is consistent with evidence from the death scene. It is this Detective's belief that evidence from this Homicide is concealed within and upon the premises of 3447 Scenic Hwy, including the vehicles and outbuildings on site.

{R. 35, PageID 196.} Later that same day, a judicial commissioner authorized a search warrant for "[n]arcotics, firearms, ammunition, portable communications devices, spent shell casings, spent projectiles, proceeds from the sale of narcotics, and DNA evidence." {R. 35, PageID 196.}

A federal grand jury indicted Vanhook for various drug and gun crimes. {R. 2, PageID 4–6.} He moved to suppress—among other things—"any and all physical evidence whether tangible or intangible"; "any and all observations of law enforcement officers"; and "other tangible or intangible evidence obtained during or as a direct or indirect result from the search of the residence" where the officers arrested him. {R. 22, PageID 35.} The government opposed the motion. {R. 24.} The district court held a suppression hearing and received evidence—including witness testimony—concerning the search. {R. 32.} At the end of the hearing, the district court took the matter under advisement and permitted the parties to file supplemental briefs on whether it was lawful for the officers to look under the couch with flashlights before they obtained a search warrant. {R. 32, PageID 173–74, R. 35, PageID 194.} In his supplemental brief, Vanhook argued—among other things—that Detective Fox's inspection under the couch exceeded the scope of the protective sweep because a person could not have fit in that space. {R. 33, PageID 184 ("Det. Fox's search underneath the couch with his flashlight, a space not big enough to allow an individual, child or adult, to hide and launch an immediate attack, in order to view the rifle amounted to a warrantless search and was impermissible.").} The government, in its supplemental brief, disagreed; it contended that—based on Detective Fox's suppression hearing testimony—the couch could have concealed a person. {R. 34, PageID 191 ("Det. Fox testified that he looked

under the couch because, in his experience with the Fugitive Apprehension Team, he knows that people have hollowed out their couches and hidden inside of them.").} The district court found Detective Fox's testimony credible and denied the suppression motion. {R. 35, PageID 200–02.} Vanhook timely appealed. {R. 62.}

## II.

Defendant challenges the district court's resolution of a motion to suppress evidence; therefore, "we review the district court's findings of fact for clear error and its conclusions of law de novo." United States v. Archibald, 589 F.3d 289, 294 (6th Cir. 2009) (citation omitted). "A factual finding is clearly erroneous when, although there may be evidence to support it, the reviewing court, utilizing the entire evidence, is left with the definite and firm conviction that a mistake has been committed." United States v. Collazo, 818 F.3d 247, 253 (6th Cir. 2016) (citation omitted). Because the district court denied the suppression motion, "we must view the evidence in the light most favorable to the government." United States v. Smith, 549 F.3d 355, 359 (6th Cir. 2008) (citation omitted).

## III.

### A.

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated," and it requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. As a consequence, "a warrantless search is *per se* unreasonable subject only to a few specifically established and well-delineated exceptions." United States v. Trice, 966 F.3d 506, 512 (6th Cir. 2020) (citation omitted). Here, the Government

asserts one of those exceptions: the warrantless-protective-sweep exception. {Plaintiff-Appellee Br. at 14–19.}

There are two types of protective sweeps. "The first type allows officers to 'look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.'" Archibald, 589 F.3d at 295 (quoting Maryland v. Buie, 494 U.S. 325, 334 (1990)). This "first type of sweep requires no probable cause or reasonable suspicion." Id. "The second type of sweep goes 'beyond' immediately adjoining areas but is confined to" "'protective sweep[s] [that are] aimed at protecting the arresting officers[.]'" Id. (third alteration in original) (citation omitted). It requires "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. (citation omitted). This second kind of sweep, however, is "not a full search of the premises," instead it "extend[s] only to a cursory inspection of those spaces where a person may be found" and must last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. (citation omitted).

B.

Defendant does not contest that the bedroom itself was within the permissible range of the protective sweep. {*Cf.* Defendant-Appellant Br. at 17 ("*While [Detective] Fox may have had reason to believe that another person was present in the residence beyond those gathered in the living room*, no facts specific to this case support a finding that he could reasonably believe that that person was under the couch in Mr. Vanhook's bedroom, particularly where that couch was only two inches off the ground and its cushions were intact and undisturbed." (emphasis added)).} He was arrested in the living room, and the bedroom was a "space[] immediately adjoining the place of arrest from which an attack could [have] be[en] immediately launched." Id. at 295

(citation omitted). Instead, he contends that Detective Fox exceeded the sweep's scope when—while inside the bedroom—he looked under the couch. {Defendant-Appellant Br. at 17.} Assuming—without deciding—that the more demanding protective-sweep standard applies because the space underneath, within, or behind the couch was not a space that immediately adjoined the place of arrest, the critical question is whether there were "articulable facts which, taken together with the rational inferences from those facts, would [have] warrant[ed] a reasonably prudent officer in believing that the area to be swept," i.e., the space under the couch, could have revealed or "harbor[ed] an individual posing a danger to those on the arrest scene." Id. (citation omitted). The answer to that question is yes.

Our sister circuits have recognized that couches can—in various ways—conceal a person.[1] Moreover, in United States v. Bass, we "f[ound] no error in the district court's conclusion" that an officer was within the bounds of a protective sweep when he lifted a box spring to check whether someone was hiding under it. 315 F.3d 561, 564 (6th Cir. 2002). And in United States v. Lanier, we agreed with the district court's "find[ing] that the police did not exceed the parameters of a protective sweep when they looked under the bed for a fugitive and found . . . ammunition." 285 F. App'x 239, 242 (6th Cir. 2008) (citation omitted).

---

[1]*See, e.g.*, United States v. Waters, 883 F.3d 1022, 1027 (8th Cir. 2018) ("We further find no error in the district court's ruling that the couch could have harbored a dangerous individual."); United States v. Paopao, 469 F.3d 760, 767 (9th Cir. 2006) ("Th[e] wall would have obstructed the officer's ability to see behind the sofa. As a result, it was reasonable for [the officer] to suspect that someone still could be hiding behind the sofa, even after the officers had completed their preliminary sweep of the other parts of the apartment."); United States v. Munoz, 150 F.3d 401, 412 (5th Cir. 1998) ("Pushing the sofa in the living room away from the wall fell within the scope of this investigation, given that suspects were known to have secreted themselves behind, inside and under sofas."); United States v. Tucker, 166 F.3d 1223, 1223 (10th Cir. 1999) (table decision) ("We cannot say that the district court was clearly erroneous in determining that the couch could have hidden a potential threat.").

Here, Detective Fox testified that people can hide—and have hidden— under, inside of, and behind couches. {R. 32, PageID 72 ("And then I got down on my knees to look under the couch because we [have] found multiple people . . . in this profession hiding under couches, hiding behind couches, and actually hiding in couches.").} Additionally, the detective testified that the officers had received information that defendant and the other homicide suspect might be together. {R. 32, PageID 64 ("[W]e [had] received information that [defendant and the other homicide suspect] might be running together").} The district court found the detective's testimony credible and it determined that (1) the couch could have been concealing someone and (2) the other homicide suspect might have been in the house. {R. 35, PageID 200 ("The [District] Court finds Detective Fox's testimony credible.").} We see no error—let alone clear error—with the district court's factual conclusions. Additionally, those two articulable facts (and the rational inferences that flow from them) would have adequately supported "a reasonably prudent officer in believing that" sweeping the area under the couch could have revealed that the other homicide suspect was (1) concealed by the couch and (2) "posing a danger to those on the arrest scene." Archibald, 589 F.3d at 295 (citation omitted). Accordingly, looking under the couch did not exceed the scope of the protective sweep.[2]

---

[2]Defendant contends that the couch was so close to the ground that it could not have been concealing anyone. {Defendant-Appellant Br. at 17.} That assertion amounts to a mere disagreement with the district court's factual finding on that point. It also fails to grapple with Detective Fox's testimony that someone could have hidden behind the couch or in a hollowed-out couch. Moreover, he has not explained how or why the "entire evidence" in the case should "le[ave] [us] with the definite and firm conviction that a mistake has been committed." Collazo, 818 F.3d at 253 (citation omitted). Additionally, in this suppression motion context, "we must view the evidence in the light most favorable to the government." Smith, 549 F.3d at 359 (citation omitted). Accordingly, defendant's argument regarding the couch's capacity to conceal a person is unpersuasive.

IV.

Defendant also asserts that the gun was not in plain view. {*See, e.g.*, Defendant-Appellant Br. at 20 ("The AR-15 style rifle was not in plain view[.]" (emphasis omitted)).} We disagree.

An object is in plain view when "an officer saw [the object] from a lawful vantage point, the 'incriminating character' of [the object] was 'immediately apparent,' and . . . the officer had 'a lawful right of access to the object itself.'" United States v. Clancy, 979 F.3d 1135, 1137 (6th Cir. 2020) (quoting Horton v. California, 496 U.S. 128, 136–37 (1990)). Despite partially labeling a subsection of his brief, "The AR-15 style rifle was not in plain view," Vanhook does not explicitly engage with the elements of the plain view doctrine. {Defendant-Appellant Br. at 20 (emphasis omitted).} At best, because defendant contends that Detective Fox exceeded the scope of the protective sweep when he looked under the couch, Vanhook's argument appears to be that the detective did not see the gun from a lawful vantage point. But, as we explained above, Detective Fox was within the bounds of a protective sweep when he inspected the space under the couch. The lawful access "requirement 'guard[s] against warrantless entry onto premises,' preventing officers from trespassing on private property merely because they spot incriminating evidence there." Clancy, 979 F.3d at 1138–39 (citation omitted). Here, the officers had permission to search the home, and once they arrested Vanhook, they had the authority to do a protective sweep of the bedroom because it was a "space[] immediately adjoining the place of arrest from which an attack could be immediately launched.'" Archibald, 589 F.3d at 295 (citation omitted). Finally, the incriminating character of the gun was immediately apparent because Vanhook was a suspect for a homicide that involved .223 caliber rounds, {R. 32, PageID 79.} and, as the district court judicially noticed, "AR-15s are commonly chambered in .223 caliber." {R. 35, PageID 200 n.5.} Accordingly, the gun under the couch was in plain view.

V.

In defendant's remaining arguments, he contends that the gun evidence should have been suppressed because (1) the search warrant that was issued after the protective sweep was invalid because it relied on information allegedly obtained outside the scope of the sweep; and (2) the *Leon* good-faith exception did not cure the officer's reliance on the allegedly invalid warrant. {Defendant-Appellant Br. at 20–28.} *See* United States v. Leon, 468 U.S. 897 (1984). Both arguments assume that Detective Fox's inspection of the space under the couch—during which he saw the gun—exceeded the scope of the protective sweep and thus constituted an illegal search. {Defendant-Appellant Br. at 22, 27.} But for the reasons we gave above, looking under the couch was within the bounds of the protective sweep and the gun was in plain sight. Accordingly, these last two arguments fail.

VI.

For these reasons, we affirm the district court's judgment.