RENDERED: SEPTEMBER 26, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2022-SC-0382-MR

SCOTT EDWARD BITTER                                        APPELLANT

ON APPEAL FROM KENTON CIRCUIT COURT
V.                  HONORABLE KATHLEEN LAPE, JUDGE
NO. 21-CR-00288-001

COMMONWEALTH OF KENTUCKY                         APPELLEE

**OPINION OF THE COURT BY JUSTICE THOMPSON**

**<u>AFFIRMING</u>**

Following the denial of his motion to suppress, Scott Bitter was found guilty by a Kenton County jury of two counts of trafficking in controlled substances and being a persistent felony offender. The trial court sentenced him to a total of twenty years' imprisonment. In this appeal, Bitter argues that the trial court erred in denying his motion to suppress because an officer, who had not yet obtained a warrant, violated his constitutional right to be free from unreasonable searches and seizures when the officer entered his apartment and testified to seeing drug paraphernalia in plain view immediately after the door was opened.

After reviewing the record, viewing the responding officer's body camera footage and hearing oral argument, we affirm the trial court's denial of Bitter's

motion to suppress and conclude that there was no violation of his constitutional rights under U.S. Const. amend. IV and Ky. Const. § 10.

## I. FACTUAL AND PROCEDURAL HISTORY

On December 5, 2020, Covington Police Officer Kevin Igo received a letter from a resident of a multi-family apartment house that another tenant, Bitter, had pistol-whipped a man and was selling drugs out of the basement of the residence. Officer Igo knew that Bitter was a convicted felon and was aware that drug users arrested in this area had reported that Bitter was their source.

Officer Igo and other officers went to the residence to investigate with a "knock and talk"[1] prior to requesting or being issued a warrant. When Officer Igo arrived at the residence, he spoke with a man who was either the boyfriend or husband of the woman who had written the letter and this man confirmed that Bitter and Susan Hornsby were living in the basement of the building and indicated that this apartment could be accessed from the rear of the house.

Officer Igo, with his body camera activated, and another officer went to the basement door and knocked but did not announce they were police officers. A male's voice from inside the basement apartment asked who it was, and Officer Igo responded with "John" and stated he was looking for "Melissa." A female voice answered saying they had "the wrong place" to which Officer Igo

---

[1] *Quintana v. Commonwealth*, 276 S.W.3d 753, 757 (Ky. 2008) ("The knock and talk procedure is a helpful and commonly used police tool, often applied in situations as mundane as looking for a lost pet or to ask if the homeowner has seen a suspicious person in the neighborhood").

2

responded that Melissa had told him to "come talk to you." Later in this exchange another male voice from inside the apartment also stated that it was the wrong house. Ultimately though, Hornsby, who had recently begun living with Bitter, opened the door.

Officer Igo testified that immediately upon the door being opened, he observed a coffee table approximately five to ten feet from the door which had drug paraphernalia on it. Officer Igo testified that this drug paraphernalia was in plain view to him on the table and included a black scale, a baggie of pink pills and a box of sandwich bags with several baggies removed. Officer Igo's body camera footage recorded him announcing to his fellow officers, "I got a scale and everything in plain view."

Officer Igo instructed Bitter and Hornsby to exit the basement. No one else could be seen in the apartment and no one else made their presence known but Officer Igo asked Bitter if anyone else was still inside. Bitter told him that another man, Jeremy, was in the back room of the basement. Jeremy only came out of the back room of the basement after being called out by name by Officer Igo. After this third person exited the basement, Officer Igo and another officer entered the basement and conducted a protective sweep based on allegations of a firearm and for the officers' safety. The basement was composed of two rooms, one of which could not be observed from the entrance doorway.

After the protective sweep, Officer Igo asked Bitter for consent to search the basement which Bitter refused. Officer Igo applied for a search warrant

based upon his plain view the digital scale, the pink pills and the baggies he saw when Hornsby opened the door to him. During the execution of the search warrant, in addition to the digital scales, baggies, and a bent spoon with burnt residue, officers recovered approximately three and one-half grams of fentanyl, over fifteen grams of methamphetamine, and a firearm. The baggy of pink pills turned out to be vitamins.

Bitter and Hornsby were both indicted on one count of first-degree trafficking in a controlled substance (two or more grams of methamphetamine while in possession of a firearm) and one count of first-degree trafficking in a controlled substance (fentanyl while in possession of a firearm). Bitter was also indicted on one count of tampering with physical evidence, one count of being convicted felon in possession of a firearm, and first-degree persistent felony offender (PFO). The trial court severed the charge of felon in possession of a firearm prior to his trial.

Bitter filed a motion to suppress pursuant to Kentucky Rules of Criminal Procedure (RCr) 9.78 which stated "[p]olice officers did not obtain consent to search" his apartment, "police allege[d] that they saw items in 'plain view' indicative of criminal activity," and "[p]olice performed a protective sweep inside of the residence before obtaining a warrant."

Based on those recited facts, Bitter argued that:

This search was illegal because the protective sweep did not fall under a valid exception to the warrantless entry of the home, the items in "plain view" did not support probable cause, and the warrant on its face was not sufficient to support probable cause.

4

For purposes of this appeal, it is important to recognize what Bitter failed to allege in his motion to the trial court: He neither alleged that officers violated "knock and talk" rules when first making contact with Bitter and Hornsby, nor that they used an improper ruse to get Hornsby to open the apartment door.

In the hearing conducted on Bitter's motion to suppress,[2] only Officer Igo was called and his unrebutted testimony was that he observed the baggies, pills and scales immediately upon Hornsby opening the door. Officer Igo was questioned by Bitter's counsel regarding the video footage of the events surrounding his contact with Hornsby and Bitter at the apartment which was preserved by his body camera and such video was viewed by the trial court. The trial court entered a written order denying Bitter's motion which detailed the facts of the encounter between Igo, Bitter and Hornsby as testified to by Officer Igo and corroborated by his body camera footage.

## II. LEGAL ANALYSIS

At the outset, in reviewing a trial court's denial of a suppression motion, we recognize that "we utilize a clear error standard of review for factual findings" and will defer to the trial court's findings of fact to the extent they are supported by substantial evidence and are not clearly erroneous. *Jackson v. Commonwealth,* 187 S.W.3d 300, 305 (Ky. 2006). Regarding the trial court's conclusions of law however, we apply a *de novo* standard of review. *Id.*

---

[2] Hornsby followed up Bitter's motion to suppress with her own which was also addressed within this hearing.

The trial court found nothing in Officer Igo's body camera footage that disproved his testimony. In pertinent part, the trial court's order recited Officer Igo testifying that "upon a woman opening the door, he saw a scale, a bag of pills (later identified as vitamins), a bent and burnt spoon, and a package of sandwich bags in plain sight on tables" and that Igo believed these items to be indicia of drug use based upon his knowledge and experience. The trial court determined, "[i]t is clear from Igo's body cam that there were items of alleged drug paraphernalia on the table in the room, and they are in plain sight of Igo. Igo immediately announces to his fellow officers that in plain view is a 'scale and everything.'"

The trial court's order also offered a specific response to Horsby's argument that the table viewed by Officer Igo was too messy for him to have had a "plain view" of the drug paraphernalia present, stating:

> Defendant Hornsby not only adopts Bitters' arguments about the issues and does not deny that the items of suspected drug paraphernalia; scales, bent and burnt spoon, a bag of pills, and a package of sandwich bags were in the rooms, but argues that they could not be in plain view as it was messy. Defense further argues that all of the items are for ordinary kitchen use. The Court is not swayed by these arguments. A review of the video from the body camera clearly shows this was not a kitchen setting, and while the area and tables were messy, Officer Igo immediately identified these items upon contact with the occupants of the room.

The trial court went on to address Bitter's allegation of an unlawful protective sweep of his apartment by concluding:

> This Court finds that the circumstances in this case for a protective sweep of both the first room, as well as, the second room (where Turner emerged) was to protect law enforcement and other individuals against the threat of unknown individuals, as well as, the suspicion that there could be a weapon on the property. Based

6

on the totality of the circumstances, this Court finds that the protective sweep was appropriate and reasonable under the circumstances presented in this case. The officers did not exceed the scope of the protective sweep.

The factual findings made by this trial court in a suppression matter are conclusive so long as they are supported by substantial evidence; thus "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Commonwealth v. Ousley*, 393 S.W.3d 15, 22–23 (Ky. 2013).

On appeal, Bitter argues that the search of his basement dwelling was conducted illegally in violation of rights under both the Fourth Amendment to the United States Constitution and Section 10 of the Kentucky Constitution. Bitter makes four separate allegations in support of his argument: (1) Officer Igo's initial contact with Bitter and Hornsby was not consensual and otherwise violated the confines of a permissible "knock and talk;" (2) Officer Igo unlawfully crossed the dwelling's threshold; (3) the unlawful nature of the evidence that Officer Igo saw "in plain view" was not immediately apparent; and (4) the trial court erred "when it held the warrantless search was predicated on a lawful protective sweep."

While Bitter asserts in his appellant brief that "this error (the legality of search of the basement by police) is preserved for appellate review," such statement is, at best, only partially correct in the context of the four separate grounds for reversal raised by him in this appeal.

7

## I.  Was the Search of the Basement Illegal?

We review the underlying facts to determine whether: (a) an unlawful entry occurred and a search was conducted prior to the issuance of a warrant; or (b) whether the actions taken by police in responding to a report of violence and illegal drug activity constituted a lawfully conducted investigation wherein drug-related items were identified in plain view, from a lawful vantage point, and without an unlawful "entry" occurring.

### A.  Was Officer Igo's Initial Contact with Bitter and Hornsby Non-Consensual and an Improperly Conducted "Knock and Talk?"— Not Preserved

Bitter did not argue to the trial court that his or Hornsby's initial contact with Officer Igo was non-consensual and/or a violation of this Court's "knock and talk" policies as set forth in *Quintana*. When such an argument is not addressed within a suppression hearing, the issue is not reviewable on appeal. *Commonwealth v. Smith*, 542 S.W.3d 276, 285 (Ky. 2018). During oral argument, Bitter's counsel conceded that this issue was not argued to the trial court, Bitter was not asking for suppression of the evidence for this reason, and these allegations were made to show a lack of voluntariness and consent in the initial encounter which resulted in Hornsby opening the door to Officer Igo.

### B.  Did Officer Igo Enter the Basement Unlawfully?

In this argument, Bitter asserts that Igo "barged through the door" and "immediately breached the threshold and was inside the apartment" as soon as Hornsby opened the door and did so without a warrant or explicit or implicit invitation. Bitter asserts that Officer Igo's body camera footage shows Igo

8

"moving past the lock mechanism on the door jamb" and cites to *Payton v. New York*, 445 U.S. 573, 590 (1980) ("Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."). At oral argument, Bitter's counsel conceded that Officer Igo was not questioned at the suppression hearing on the issue of if or when he crossed the threshold of the doorway when it was opened to him.

This Court conducted an independent review of Officer Igo's body camera footage to attempt to determine whether or not he breached the threshold of the apartment and therefore "entered" the apartment prior to seeing the table and drug paraphernalia. Following that review, a majority of this Court has determined that the body camera footage does not conclusively disprove Officer Igo's unrebutted testimony that he viewed drug paraphernalia immediately upon Hornsby opening the door to him and otherwise does not support Bitter's allegation that Officer Igo physically crossed the threshold of the basement door prior to his eyes seeing, in plain view, the table with evidence of drug activity.

### C. Was the Incriminating Nature of the Evidence in Plain View to Officer Igo Immediately Apparent?

Bitter contends that Officer Igo could not have positively recognized drug paraphernalia from his vantage point in the doorway given the other "mess" on the table and that such identification could have only come during the later protective sweep. Bitter contends that only the scales might have been positively identifiable on the table from the vantage point of the doorway and

9

that scales alone would not provide probable cause to believe there was illegal drug activity occurring.

The only real issue here is whether or not the trial court's determination that "[i]t is clear from Igo's body cam that there were items of alleged drug paraphernalia on the table in the room, and they are in plain sight of Igo" was clearly erroneous.

Having independently reviewed both the hearing and Officer Igo's body camera footage, a majority of this Court cannot agree with Bitter that the trial court's determination, based as it was on both the body camera video and Officer Igo's testimony,[3] could be found to be clearly erroneous. While being an invaluable tool to both law enforcement and our courts, body camera footage can be a poor substitute for trained human eyes, especially when it comes to recognizing details in a fluid situation where the camera's perspective is not synchronous to the eyes of the officer wearing it and lighting comes into play.

Officer Igo stated that "I got a scale and everything in plain view" almost immediately after the apartment door was opened to him by Hornsby. The fact that he did not also instantly verbally identify each item of "everything" he observed in that first moment does not persuade us that he did not immediately recognize the remaining and obviously drug-related items strewn across the table. These items would have created more than a mere suspicion

---

[3] *See Henson v. Commonwealth*, 20 S.W.3d 466, 470 (Ky. 1999) ("the trial court is the sole trier of facts and the exclusive judge of the credibility of the witnesses and of the weight to be given their testimony").

and their "incriminating nature" would have been immediately apparent to any trained and experienced officer. *See Commonwealth v. Hatcher*, 199 S.W.3d 124, 127 (Ky. 2006).

The various items present on the table in plain view to Officer Igo from the doorway and recognized by him were, *en toto*, sufficient to justify the issuance of the subsequent warrant which led to their seizure.

### D. Did the Trial Court Err by Ruling the Warrantless Search was Predicated on a Lawful Protective Sweep?—Preserved

Lastly, Bitter argues that the trial court erred in determining "the protective sweep was appropriate and reasonable under the circumstances presented in this case" and since three persons had already exited the residence and were not yet under arrest, there was no need for, or lawful argument for, a protective sweep, citing to *Guzman v. Commonwealth*, 375 S.W.3d 805 (Ky. 2012), *Kerr v. Commonwealth*, 400 S.W.3d 250 (Ky. 2013) and *Brumley v. Commonwealth*, 413 S.W.3d 280 (Ky. 2013).

This argument is a proverbial "red herring" in this particular case and was only addressed by the trial court because it was raised by Bitter. Discussion of the underlying facts which led officers to conduct a sweep of Bitter's apartment prior to obtaining a warrant, would only merit further discussion here *if* the drug-related paraphernalia had *only* been observed by Officer Igo during the sweep and had not already been viewed by him from the doorway prior to the sweep being performed. Officer Igo testified that he was

11

able to observe drug paraphernalia in plain view, from a lawful vantage point.[4] Such observations were sufficient for the warrant ultimately obtained and we conclude that neither the sweep conducted, nor the officer's rationale for such a sweep, could have served as a proper basis for the trial court to have granted Bitter's motion to suppress.

### III. CONCLUSION

Because Covington police ultimately obtained a search warrant based on the observations made by Officer Igo, the only substantive issues requiring resolution in this case were whether Officer Igo could have made his observation of drug paraphernalia despite the clutter on the table in question and whether those observations were made from a lawful vantage point outside the residence.

Having determined that the trial court's own findings of fact on those issues were not clearly erroneous, we affirm the order by the Kenton Circuit Court denying Bitter's motion to suppress and affirm his conviction and sentence.

All sitting. VanMeter, C.J.; Bisig, Keller, and Nickell, JJ., concur. Lambert, J., dissents by separate opinion in which Conley, J., joins.

LAMBERT, J., DISSENTING. While I do not dispute that the officers in this case removed an armed and allegedly violent drug trafficker from the community, I am compelled to emphasize that the protections provided by the

---

[4] *See Hazel v. Commonwealth,* 833 S.W.2d 831, 833 (Ky.1992).

Fourth Amendment against impermissible intrusion by government agents into the home belong to everyone, including armed and allegedly violent drug traffickers. And, while I would not argue in favor of overturning such an individual's convictions lightly, I am deeply disturbed by the blatant Fourth Amendment violations that occurred in this case. Officer Igo's body camera footage clearly showed that he was facing the full width of the interior staircase to his right as he moved into the dwelling as the door was opened.[5] This was a clear and inexcusable violation of Bitter's Fourth Amendment rights.

But, before reaching the merits, I would like to clarify the fundamental Fourth Amendment doctrines that are involved in this case. I fully acknowledge many of these issues were not argued before the circuit court and have therefore not been preserved for our review. Nevertheless, at the very least, a thorough discussion may provide clarity to the bench, bar, and law enforcement such that the Fourth Amendment violations that occurred in this case might be avoided in the future.

First, and of the upmost importance, the Fourth Amendment of the United States Constitution, made applicable to the states via the Fourteenth Amendment, states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly

---

[5] It is at times like these that, for the reader's sake, I long for a hyperlink that would take the reader to the video of the body camera footage so it could be seen, and the gravity of the violation better understood.

13

describing the place to be searched, and the persons or things to be seized.[6]

"[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972)). As such, "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a [search] warrant are presumptively unreasonable," *Payton*, 445 U.S. at 586, "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). And, "[t]he Commonwealth carries the burden to demonstrate that the warrantless entry falls within a recognized exception to the warrant requirement." *Kerr v. Commonwealth*, 400 S.W.3d 250, 266 (Ky. 2013) (quoting *King v. Commonwealth*, 386 S.W.3d 119, 122 (Ky. 2012)).

The established and well-delineated exceptions that grant law enforcement the authority to enter someone's home without a search warrant are: (1) "the consent of a person with the authority to give such permission." *Simpson v. Commonwealth*, 474 S.W.3d 544, 548 (Ky. 2015); (2) an arrest warrant, which "implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* (quoting *Payton*, 445 U.S. at 603); (3) exigent circumstances

---

[6] *Accord* Ky. Const. § 10 ("The people shall be secure in their persons, houses, papers and possessions, from unreasonable search and seizure; and no warrant shall issue to search any place, or seize any person or thing, without describing them as nearly as may be, nor without probable cause supported by oath or affirmation.").

such as rendering emergency aid, *Hughes v. Commonwealth*, 87 S.W.3d 850, 852 (Ky. 2002), the "hot pursuit" of a fleeing subject, *see King*, 386 S.W.3d at 122, or the feared destruction of evidence, *Commonwealth v. McManus*, 107 S.W.3d 175, 177 (Ky. 2003); and (4) a protective sweep is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Kerr*, 400 S.W.3d at 266 (quoting *Maryland v. Buie*, 494 U.S. 325, 326 (1990)).[7]

Before further discussion of the requirements for a legal protective sweep, it is crucial to note that an officer seeing illegal items in "plain view," alone, is *not* an established exception to the requirement that law enforcement must have a search warrant *to enter someone's home.* Rather, the plain view doctrine is an exception to the requirement that law enforcement must have a search warrant *to seize evidence.* *See, e.g.*, *Hazel v. Commonwealth*, 833 S.W.2d 831, 833 (Ky. 1992) (citing *Coolidge v. New Hampshire*, 403 U.S. 443 (1971)) ("[T]he courts have allowed several exceptions for seizures without warrants—one of these being evidence found within 'plain view.'"). The plain view doctrine allows the warrantless seizure of evidence if three elements are satisfied:

> First, the law enforcement officer must not have violated the Fourteenth Amendment in arriving at the place where the evidence could be plainly viewed. Second, "not only must the officer be

---

[7] Both the United States Supreme Court and this Court have also recognized that "because of the 'special needs' presented by law enforcement, a state may issue regulations allowing a probation or parole officer to search a probationer's or parolee's property without a warrant." *Riley v. Commonwealth*, 120 S.W.3d 622, 627 (Ky. 2003) (citing *Griffin v. Wisconsin*, 483 U.S. 868, 869 (1987)).

> lawfully located in a place from which the object can be plainly seen, but he or she must have a lawful right of access to the object itself." Finally, the object's "incriminating character must also be 'immediately apparent.'"

*Hazel*, 833 S.W.2d at 833 (quoting *Coolidge*, 403 U.S. at 466). But the plain view doctrine has *never* been used to justify an otherwise unlawful entry into an individual's home. Indeed, "even where the object is contraband [the United States Supreme Court] has repeatedly stated and enforced the basic rule that police may not enter and make a warrantless seizure[]" relying solely on plain view, plain smell, or plain sound. *Horton v. California*, 496 U.S. 128, 137 n. 7 (1990) (quoting *Coolidge*, 403 U.S. at 468) (collecting cases).

By way of example in *Taylor v. United States*, a Prohibition era case, federal agents had received complaints for over a year regarding the defendant's residence. 286 U.S. 1, 5 (1932). One night, without possessing a warrant, consent, or exigent circumstances the agents approached a garage adjacent to the defendant's residence and "got the odor of whisky coming from within. Aided by a searchlight, they looked through a small opening and saw many cardboard cases" that they believed contained liquor. *Id.* at 5-6. The officers "broke the fastening upon a door," entered the garage, and discovered 122 cases of whisky; the defendant was later convicted of unlawful possession of intoxicating liquor. *Id.* at 1-5. The U.S. Supreme Court reversed and held that the cases of whisky should have been suppressed, reasoning:

> [T]he action of the agents was inexcusable and the seizure unreasonable . . . . Prohibition officers may rely on a distinctive odor as a physical fact indicative of a possible crime; but its presence alone does not strip the owner of the building of

16

constitutional guarantees (Const. Amend. 4) against unreasonable search.

*Id.* at 6.

Similarly, in *McDonald v. United States*, the defendant had been under police observation for several months as he was believed to be involved with an illegal gambling operation colloquially known as the numbers game. 335 U.S. 451, 452 (1948). On the day of the defendant's arrest, officers, not armed with a warrant, consent, or exigent circumstances, surrounded the boarding house in which the defendant had been renting a room. *Id.* "While outside the house, one of the officers thought that he heard an adding machine[,]" a device typically used in the numbers' operation. *Id.* One of the officers entered the house through a window in the landlady's room and thereafter admitted the other officers into the house. *Id.* at 453. After searching the first floor, the officers proceeded to the second floor and observed a closed door. *Id.* One of the officers stood on a chair, looked through the door's transom, and "observed [the defendant] in the room, as well as numbers slips, money piled on the table, and adding machines." *Id.* The defendant was arrested after following the officers' command to open the door. *Id.* The U.S. Supreme Court held that evidence of the adding machines and papers should have been suppressed. *Id.* at 456. It reasoned:

> We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy

17

in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals . . . . And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.

*Id.* at 455-56. *See also, e.g., Chapman v. United States*, 365 U.S. 610 (1961); *Jones v. United States*, 357 U.S. 493 (1958); *Johnson v. United States*, 333 U.S. 10 (1948).

This Court has likewise recognized that an officer seeing a potentially illegal item in plain view does not, alone, authorize entry into a person's home. In *Hatcher v. Commonwealth*, officers received an anonymous complaint about an abandoned minor, responded to Hatcher's home, and knocked on the front door. 199 S.W.3d 124, 125 (Ky. 2006). When Hatcher's adolescent son opened the front door one of the officers observed "a pipe sitting on a table in the front room" that he believed to be a marijuana pipe. *Id.* Upon the officer's request, the minor allowed the officer to enter the home at which point he picked up the pipe and detected the smell of marijuana emanating from it. *Id.* Hatcher was later convicted of possession of drug paraphernalia, second offense, after the trial court denied her motion to suppress the pipe. *Id.*

This Court reversed after determining that the officer's actions violated the second and third requirements of the *Hazel* test, *supra*. *Id.* at 126-28. Relevant to this case, the *Hatcher* Court held that the officer did not have "a lawful right of access" to the pipe, *Hazel*, 833 S.W.2d at 833, because he "was

18

not authorized to enter Hatcher's residence[.]" *Hatcher*, 199 S.W.3d at 127.

The Court explained that, while the officer "was certainly authorized to knock

on Hatcher's door to respond to the report of an allegedly abandoned minor"

and was also permitted to look through the open door into the house while

standing on the porch, the officer

> did not have a warrant authorizing his entry into Hatcher's
> residence.  As such, his entrance must have been precipitated by
> some exigent circumstance, such as threat of injury or destruction
> of evidence.
>
> . . .
>
> [N]ot even [the officer] alleged any exigent circumstances which he
> believed justified his immediate entry into the home.  There was
> certainly no argument presented to the trial court that the
> adolescent was perceived as a threat or that there was any fear he
> would destroy or conceal the pipe.  "Before agents of the
> government may invade the sanctity of the home, the burden is on
> the government to demonstrate exigent circumstances that
> overcome the presumption of unreasonableness that attaches to all
> warrantless home entries."

*Id*. at 126-27 (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984)).  The

Court did not address whether the child's consent to the officer entering the

home made the search legal, as the Commonwealth's sole justification for the

search was the plain view doctrine.  *Hatcher*, 199 S.W.3d 128.  *See also Pace v.*

*Commonwealth*, 529 S.W.3d 747, 755 (Ky. 2017) (holding that "[the plain view]

exception cannot justify an otherwise unlawful intrusion just because it may

bring the officers within plain view of the evidence.  Since this exception only

excuses the seizure of evidence, not warrantless searches. . . the trial court

erred in finding that the plain view doctrine permitted the officers' warrantless

entry and search of Appellants' apartment.").

19

This brings me to protective sweeps.  In *Buie,* the United States Supreme Court discussed that in its previous cases addressing reasonableness under the Fourth Amendment it had "balanced the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."  494 U.S. at 331.  Under this balancing act "a search of the house or office is generally not reasonable without a warrant issued by probable cause." *Id.*  However, the Court noted that there are certain contexts in which "the public interest is such that neither a warrant nor probable cause is required." *Id.*  The Court held that the interest of police officers in "taking steps to assure themselves that the house in which a suspect is being, or has been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack" is one such public interest that permits law enforcement to conduct a protective sweep of a home absent a search warrant.  *Id.* at 333.  However, the *Buie* Court placed very specific limitations on the ability of the police to conduct protective sweeps.  *Id.* at 334.  It held that

> as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.
>
> . . .
>
> We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend

20

only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

*Id.* at 334-36.

This Court explicitly adopted *Buie* in *Guzman v. Commonwealth*, 375 S.W.3d 805, 807 (Ky. 2012). Since *Guzman*, this Court has addressed whether the *Buie* test was satisfied during a given protective sweep several times. In each of those cases, there was an explicit determination that the protective sweep at issue was either the "first type" of protective sweep, i.e., a search of "spaces immediately adjoining the place of arrest from which an attack could be immediately launched[,]" and therefore required "neither probable cause nor reasonable suspicion[.]" *See Barrett v. Commonwealth*, 470 S.W.3d 337 (Ky. 2015); *Kerr*, 400 S.W.3d at 267. Or, whether the protective sweep at issue was of the "second type," meaning that the search extended beyond the area immediately adjoining the place of arrest, for which law enforcement must have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *See Simpson v. Commonwealth*, 474 S.W.3d 544, 549 (Ky. 2015); *Brumley v. Commonwealth*, 413 S.W.3d 280, 288 (Ky. 2013).

With the foregoing principles established, I will address the merits of the case now before us.

21

During the hearing on Bitter's motion to suppress Officer Igo testified that he had received a written complaint from a woman that lived at 836 Crescent Avenue which stated that Bitter had pistol whipped another individual and was also selling narcotics out of the separate living space below the complainant's apartment, which Bitter was renting. He further testified that he was familiar with Bitter and knew him to traffic drugs based on statements from individuals he had recently arrested for drug possession who identified Bitter as their dealer. The dwelling at 836 Crecent Avenue was a single building separated into two living spaces: an apartment on the top floor which was separated from a basement area by a locked door. A married couple lived in the upstairs apartment, while Bitter and Hornsby were renting the space below the upstairs apartment. Both the apartment and the dwelling below had their own "front doors." Officer Igo and several other officers responded to 836 Crescent Avenue to further investigate the woman's complaint. When the officers responded to the dwelling, they had neither an arrest warrant nor a search warrant and no exigent circumstances were present.

Officer Igo's body camera footage, which was provided in its entirety to the circuit court, showed that the following occurred when the officers arrived at the residence. Initially, the officers knocked on the front door of the upstairs apartment and spoke to the complainant's husband. He confirmed that Bitter was living in the basement space and gave the officers permission to go around the side of the building to access its door. When the officers initially knocked

on the door no one opened it, but a male voice could be heard asking "who is it?" to which the officers respond "John." The male voice asked who they were looking for and Officer Igo responded "Melissa." The male told them they had the wrong place to which Officer Igo responded, "Melissa said to come talk to you." The male asked who Melissa is and the officer responded, "she lives upstairs." The male again told them they had the wrong place. The officers knocked again and continued to stand at the door for a little over a minute, at which point the door was opened by Hornsby, and Officer Igo stepped forward across the threshold as the door opened.

The basement dwelling's layout was as follows. The door opened inward, on left hand hinges, to a room with a staircase leading to the upstairs apartment to the immediate right of the entryway. There was a couch next to the staircase with both a coffee table and an ottoman next to it. The coffee table was heavily cluttered, and the ottoman also had several items on it. The dwelling had two rooms. The entrance to the second room was straight across from the front door approximately ten feet away; it did not have a door or covering.

When Hornsby opened the door for police, Officer Igo simultaneously stepped into the dwelling without asking for consent to do so. He then commanded Bitter, who was standing near the entrance to the second room, to "come here." Bitter immediately complied. As soon as Bitter reached the front door Officer Igo commanded him to exit his home and stand on the front porch area. Bitter complied. Officer Igo then ordered Hornsby out of the dwelling by

saying, "Step right there. Step right here. Step right here! I'm not going to tell you again." She also complied. Once Bitter and Hornsby were outside two other officers patted them down and placed them in handcuffs while Officer Igo directed, "Yeah, just detain them both for now."

As Officer Igo was commanding Hornsby to exit the residence, his body camera showed that he was standing directly in front of the staircase to the right of the door, i.e., he was still standing inside the dwelling and had been since Hornsby opened the door. Once Hornsby was outside, Officer Igo announced to the other officers, "I've got a scale and everything in plain view." Officer Igo would later testify that he saw a digital scale, a bent and burnt spoon, plastic baggies, and a baggie of pills (later determined to be vitamins) on the coffee table and ottoman, respectively. As Hornsby and Bitter were being handcuffed, Officer Igo continued to stand inside the dwelling near its entryway. He asked Bitter if there was anyone else "in there." Bitter responded that someone was upstairs. After Officer Igo clarified that they had already spoken to the man upstairs, both Bitter and Hornsby told the officers "Jeremy is in there." Officer Igo then identified himself as a police officer and ordered him to come out. Jeremy Turner immediately emerged from the second room with his hands up. Officer Igo had Turner sit on the stairway to the upstairs apartment and asked if anyone else was in Bitter's apartment. Turner responded that there was not. At that point Officer Igo again announced, "I've got paraphernalia and everything in plain view" and asked his sergeant what he should do next.

24

After Officer Igo had already been standing in Bitter's residence for several minutes, his sergeant told him to perform a protective sweep to ensure no one else was in it. Officer Igo and a second officer then went to the dwelling's second room and cleared it. Afterwards, the officers returned to the front room and stood looking at the coffee table and ottoman with their flashlights. Officer Igo said to the other officer, "It's all in plain view bag it up."[8] The officers did not discover any additional evidence of criminal activity in plain view during the sweep nor did they find anyone else in the dwelling. Officer Igo then placed Turner, who had been sitting on the staircase responding to questioning by another officer, in handcuffs and told him he was being detained. Turner was later permitted to leave the scene and was not charged with any crime.

While still standing in the middle of the dwelling's front room, Officer Igo began pointing to the table and the ottoman and told his sergeant, "So when she opened the door I seen (sic) the scale in plain view, the pills bagged, and then the paraphernalia." His sergeant told him to ask for consent to search, which Bitter did not give. Bitter, Hornsby, and Turner were then separated and Officer Igo interrogated Hornsby at the scene after he provided her with her *Miranda* warnings. Hornsby admitted that she knew Bitter sold marijuana but denied that he sold Fentanyl. When Officer Igo told Hornsby that he knew

---

[8] While the items of paraphernalia may have ultimately been bagged and confiscated by the officers, neither Bitter nor Hornsby were indicted for possession of drug paraphernalia.

25

Bitter sold methamphetamine, she responded, "Yeah." When he asked her if there was a firearm in the dwelling, she said she was not sure but acknowledged she had seen him with a gun sometime previously. Officer Igo then relayed that information to his sergeant and a search warrant was obtained.

The application for a search warrant was not included in the record before us, but my understanding is the application was based on both the paraphernalia Officer Igo saw in plain sight on the coffee table and ottoman and Hornsby's mirandized statements. When the search warrant was executed in Bitter's residence, the officers found, in relevant part, methamphetamine, fentanyl, and a handgun. Bitter was never indicted for possession of paraphernalia. Accordingly, his motion to suppress did not seek suppression of the items Officer Igo saw in plain sight. Rather, Bitter sought to suppress the items seized pursuant to the search warrant: the methamphetamine, fentanyl, and handgun. This is an odd set of circumstances given that, in a typical plain view seizure case, an officer will seize illegal items without a search warrant based on the plain view justification, and the defendant will thereafter seek suppression of *those* items. Here, the items seen in plain sight instead formed at least part of the basis for the search warrant itself. And, as I discuss below, the question of whether the items obtained pursuant to the search warrant should have been suppressed based on the officer's initial unlawful entry into the dwelling, or whether the evidence could nevertheless

26

have been admissible based on an exception to the fruit of the poisonous tree doctrine remains unanswered.

As for the unlawful entry itself, the officers responded to 836 Crescent Avenue to follow up on a non-anonymous complaint by a woman who lived in the upstairs apartment who claimed, in part, that Bitter was trafficking drugs out of his basement dwelling. They were therefore conducting a "knock and talk." A knock and talk is a procedure that allows "law enforcement officers [to approach] a home for the purpose of obtaining information about a crime that has been committed, a pending investigation, or matters of public welfare" provided that it is "limited to only the areas which the public can reasonably expect to access." *Quintana v. Commonwealth*, 276 S.W.3d 753, 756-59 (Ky. 2008).

When Officer Igo arrived, he without question knew that the basement space was Bitter's home based on both the complaint and the statements of the man living in the apartment above it. Accordingly, because Officer Igo did not have a search warrant, an arrest warrant, exigent circumstances, or Bitter's consent, he had absolutely no legal authority to immediately enter the dwelling and order the occupants to vacate when Hornsby opened the door. The only other exception that could have enabled him to enter the dwelling was the performance of the protective sweep, which is discussed below. However, the protective sweep did not occur until well after Officer Igo entered and it was not his initial basis for doing so.

27

Much ado has been made over whether Officer Igo entered the dwelling *prior* to seeing the paraphernalia in plain sight, or whether he saw the paraphernalia *after* he entered the dwelling. Indeed, the Majority holds that

> the body camera footage does not conclusively disprove Officer Igo's unrebutted testimony that he viewed drug paraphernalia immediately upon Hornsby opening the door to him and otherwise does not support Bitter's allegation that Officer Igo physically crossed the threshold of the basement door prior to his eyes seeing, in plain view, the table with the evidence of drug activity.

But whether Officer Igo saw the paraphernalia in plain sight before or after he entered the dwelling makes absolutely no difference. The fact of the matter is Officer Igo entered the dwelling immediately after the door was opened and remained in it thereafter without any legal justification to do so because, as discussed at length above, plain sight *is not* and has never been an established exception to the requirement that law enforcement must have a search warrant before they enter someone's home. Assume for argument's sake that Officer Igo remained on the front porch after Hornsby opened the door, as he should have.[9] Then, while still standing on the porch, he saw the items of paraphernalia in plain sight. That scenario *still* would not have granted him authority to enter the dwelling because, as both this Court and the United States Supreme Court have held repeatedly, plain sight alone is not an exception to the requirement that law enforcement must have a search warrant

---

[9] *See Quintana*, 276 S.W.3d at 759 (holding that when police are conducting a knock and talk, "[u]nless an officer has probable cause to obtain a warrant or exigent circumstances arise, the intrusion can go no further that the approach to the obvious public entrance of the house.")

to justify the enormous invasion of privacy that occurs when a government agent enters someone's home. Officer Igo should have instead remained on the porch, viewed the paraphernalia from that lawful vantage point, and then used that observation in conjunction with his personal knowledge of Bitter's trafficking activities and the complaint of Bitter's upstairs neighbor to obtain search warrant prior to entering Bitter's dwelling. I have seen nothing in this record that justified his failure to do so, and I fear that the Majority's opinion may be interpreted to hold that plain sight is now an exception to the warrant requirement for government entry into a home. I consequently cannot join it, nor can I agree with its conclusion that "there was no violation of [Bitter's] constitutional rights under U.S. Const. amend. IV and Ky. Const. § 10."

In his written motion to suppress, Bitter argued that the officers' warrantless search of his residence violated the Fourth and Fourteenth Amendments of the United States Constitution and Section 10 of the Kentucky Constitution "because the protective sweep did not fall under a valid exception to the warrantless entry of the home, the items in 'plain view' did not support probable cause, and the warrant on its face was not sufficient to support probable cause." Consistent with his motion to suppress, Bitter's arguments during the suppression hearing primarily focused on challenging the protective sweep rather than the officers' initial unlawful entry. However, he did argue during closing arguments that, under the *Hazel* test, Officer Igo did not have a "lawful right of access" to the paraphernalia he saw in plain view on the coffee table and ottoman. Specifically, he asserted that, "When the door is first

29

opened, as Mr. Bitter and Ms. Hornsby are coming out you can see first Officer Igo steps into the door before anything has really happened."

The circuit court's order denying Bitter's motion to suppress did not address Bitter's allegation that Officer Igo unlawfully entered the dwelling immediately after Hornsby opened the door. Rather, it disposed of the issue entirely on the grounds that the protective sweep was lawful and that "Officer Igo immediately identified [the paraphernalia] upon contact with the occupants of the room." The entirety of the circuit court's legal analysis was as follows:

> A warrantless search of an individual's private residence, absent exigent circumstances, is prohibited by the Fourth Amendment to the United States Constitution. *Carter v. Commonwealth*, 449 S.W.3d 771, 774 (Ky. App. 2014). *Commonwealth v. McManus*, 107 S.W.3d 175 (Ky. 2003). *Maryland v. Buie*, [494 U.S. 325 (1990)], expanded the scope of permissible warrantless searches to include a limited protective sweep in conjunction with an in-home arrest. In 2012 [t]he Supreme Court of Kentucky adopted the holding of *Buie* in *Guzman v. Commonwealth*, 375 S.W.3d 805, 808 (Ky. 2012). In *Guzman*, the Court defined a permissible protective sweep to include all or part of an individual's home when officers possess an objective reasonable belief that the residence may be harboring a dangerous person. *Id.*
>
> *Buie* permits "two types of protective sweeps incident to an arrest that are reasonable and lawful under the Fourth Amendment." *Kerr v. Commonwealth*, 400 S.W.3d 250, 266 (Ky. 2013). The first type allows officers "as a precautionary matter and without probable cause or reasonable suspicion, [to] look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.["] The second type "allows officers to undertake a broader search of places not adjacent to the place of arrest if here are 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonable prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *Id. see also Terry v. Ohio*, [392 U.S. 1, 21 (1968)] ("[i]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together

30

with rational inferences from those facts, reasonably warrant that intrusion."). This is the well-known reasonable suspicion standard. *See Terry*, [392 U.S. at 1].

The Supreme Court of Kentucky addressed the second type of sweep in *Brumley v. Commonwealth*, 413 S.W.3d 280 (Ky. 2013). In *Brumley*, the Court found that officers had violated the Fourth Amendment because the sweep conducted did not comply with the *Buie* requirements. Specifically, knowledge of firearms in a residence, as well as, noise emanating from the residence did not provide officers with the requisite reasonable suspicion to conduct a protective sweep of the residence for an individual posing a danger to officers on the scene. *Id.* at 288. "Reasonable suspicion must be determined under the totality of the circumstances, considering all of the information available to law enforcement officials at the time." *Id.*

The justification for a protective sweep is the safety threat posed to officers by unseen individuals in the residence. *Brumley v. Commonwealth*, 413 S.W.3d 280, 285 (Ky. 2013). **This Court finds that the circumstances in this case for a protective sweep of both the first room, as well as, the second room (where Turner emerged) was to protect law enforcement and other individuals against the threat of unknown individuals, as well as, the suspicion that there could be a weapon on the property. Based on the totality of the circumstances, this Court finds that the protective sweep was appropriate and reasonable under the circumstances presented in this case. The officers did not exceed the scope of the protective sweep**.

Defendant Hornsby not only adopts Bitters' arguments about the issues and does not deny that the items of suspected drug paraphernalia; scales, bent and burn (sic) spoon, a bag of pills, and a package of sandwich bags were in the rooms, but argues that they could not be in plain view as it was messy. Defense further argues that all of the items are for ordinary kitchen use. This Court is not swayed by these arguments. A review of the video from the body camera clearly shows this was not a kitchen setting, and while the area and tables were messy, Officer Igo immediately identified these items upon contact with the occupants of the room.

(Emphasis added).

I assert that there are several problems with the circuit court's findings of fact and conclusions of law regarding the protective sweep. Significantly, it failed to recognize that, while a protective sweep can be an exception to the warrant requirement for entry into a home, the sweep in this case occurred well after Officer Igo made his initial unlawful entry and that initial entry was accordingly not made while conducting the protective sweep. In addition, while the circuit court correctly identified the two "types" of *Buie* sweeps, it failed to identify which type occurred here and, by extension, the factual basis justifying it. To conclude that the sweep was of the "first type," and therefore required neither reasonable suspicion nor probable cause, would have necessitated a finding by the circuit court that the sweep occurred in a space "immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334. But the only fact finding the circuit court made regarding the protective sweep was: "The officers then [perform] a protective sweep, to [ensure] no one else is hiding in the rooms and based on the allegations of Bitter having a weapon. The sweep is conducted of the two rooms, taking less than a minute to complete, and is recorded on Igo's body cam."

Similarly, for the circuit court to have concluded that the protective sweep was justified as the "second type" of *Buie* sweep, it first had to find that the sweep went beyond the area "immediately adjoining the place of arrest." It then had to find that the officers had "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably

32

prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Assuming arguendo that the circuit court believed that the protective sweep was of the "second type," its finding that its purpose was "to protect law enforcement against the threat of unknown individuals" and the "suspicion that there could be a weapon on the property" were insufficient justifications.

In *Brumley*, officers arrested the defendant outside his home and thereafter performed a protective sweep inside the home after hearing "rustling" or "shuffling" therein which turned out to be the arrestee's dog. 413 S.W.3d at 283. The *Brumley* Court first determined that the sweep was of the "second type" as it did not occur in an area adjacent to the defendant's arrest. *Id.* at 284-85. The Court then rejected the Commonwealth's argument that the search was justified based on the officers' knowledge that there may have been a gun in the residence, stating: "we accept that some prior information existed between the officers concerning the presence of guns at Brumley's residence. Nevertheless, the mere presence of guns at the home of an arrestee does not automatically rise to the level of reasonable suspicion that would justify a protective sweep." *Id.* at 286.

The *Brumley* Court also rejected the argument that the noises emanating from the home created a reasonable suspicion that the home harbored an individual that posed a threat to the officers. *Id.* at 286-88. It reasoned:

> The undiscovered individual must be more than just a fellow resident. There must be some indication that the hidden third party may be a danger to officers on the scene. Justifying a

33

protective sweep on the ground that law enforcement officers had no information at all is directly contrary to the Supreme Court's explicit command in *Buie*. [*United States v. Archibald*, 589 F.3d 289, 300 (6th Cir. 2009)]. A valid protective sweep requires "that the police have an articulable basis on which to support their reasonable suspicion of danger from inside the home." *Id.* The absence of information cannot be an articulable basis for a protective sweep that requires information to justify it in the first place. *Id.*

In this case, the officers had no information whatsoever that an accomplice or other third party may have been with Brumley in the residence. Again, several federal cases prove instructive when determining the possibility of the existence of potential assailants. In *United States v. Biggs*, the United States Court of Appeals for the Sixth Circuit approved a sweep based on several factors, including (1) the police had received information that another person would be meeting the defendant at his motel room, and (2) the defendant had previously been arrested on multiple occasions in the presence of someone with a firearm. 70 F.3d 913, 916 (6th Cir.1995); *see also* [*United States v. Atchley*, 474 F.3d 840, 844, 849-850 (6th Cir. 2007)]. Under the totality of the circumstances, police officers in these cases had, at a minimum, reasonable suspicion that potentially dangerous criminal accomplices may have been present.

Moreover, the arrest warrant issued for Brumley was for possession of a controlled substance which did not involve accomplices. Similarly, the arrest warrants involved in *Archibald* were for probation violations which did not involve accomplices, and "therefore did not raise concerns that an accomplice might be present in Archibald's apartment at the time of his arrest." *Archibald*, 589 F.3d at 299. Neither the felony arrest warrant nor any other evidence in this case directly or indirectly implicated that accomplices may have been present at Brumley's residence at the time of his arrest.

*Brumley*, 413 S.W.3d at 287-88. In this case, when the officers conducted the sweep, they had no reason to believe that anyone other than Bitter, Hornsby, and Turner were in the dwelling. Bitter and Hornsby were fully cooperative with the officers and were forthcoming about Turner's presence when asked.

34

Officer Igo's testimony did not provide a reasonable articulable basis on which to support a conclusion that another, potentially dangerous, person was in the dwelling. Moreover, the complaint alleged that Bitter had pistol whipped someone but, in accordance with *Brumley*, a mere allegation of the presence of a gun "does not automatically rise to the level of reasonable suspicion that would justify a protective sweep." *Id.* at 286.

Accordingly, because the circuit court did not make a factual finding as to whether the sweep occurred in an area immediately adjacent to where Bitter and Hornsby were detained and from where an attack could have been immediately launched, there is no basis to uphold its decision assuming that it concluded the sweep was of the "first type" of *Buie* sweep. And, while it is unclear as to which type of sweep the circuit court believed the officers in this case to have conducted, if the circuit court believed it was of the second type, its findings concerning the justification for the sweep were insufficient.

Moreover, I disagree with the circuit court's conclusion that the officers "did not exceed the scope of the protective sweep." As stated in *Buie*, a "sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Buie*, 494 U.S. at 335-36. In this case, though the officers illegally entered the dwelling, they should have exited once they were satisfied from the protective sweep that there was no one else in it. Instead, after the officers cleared the dwelling's second room, they returned to the front room and stood in it while looking over the contents of the table and the ottoman with their

35

flashlights.  Even if one were to ignore the initial unlawful crossing of the threshold, this exceeded the bounds of what they were permitted to do once they were satisfied that there was no one else in the dwelling.  Additionally, if the officers had remained outside the dwelling from the time Hornsby opened the door, as they were supposed to, entering the dwelling to conduct a protective sweep would have created a far greater risk to the officers that would not have otherwise existed if they would have remained on the porch.  *See Guzman*, 375 S.W.3d at 809 (Cunningham, J., concurring) ("If you do not deem it safe to enter the living room, do not enter.  In a 'knock and talk' conducted in such ominous situations, one might consider continuing the investigation on the front porch.").

I would also note that the protective sweep in this case did not occur incident to an in-home arrest; rather, it occurred while Bitter and Hornsby were detained outside.  *Buie* specifically held that "*as an incident to arrest* the officers could, as a precautionary matter" conduct a protective sweep, provided one of the two *Buie* tests were satisfied.  494 U.S. at 334 (emphasis added).  And, while our Court of Appeals has concluded that a protective sweep may be conducted in the absence of an arrest, *Brown v. Commonwealth*, 423 S.W.3d 765, 770 (Ky. App. 2014), neither this Court nor the United States Supreme Court has ever rendered a ruling addressing that issue.

While on the issue of detainment, I am also greatly concerned by Officer Igo's act of immediately ordering Bitter and Hornsby out of their home as he stepped across the threshold.  As soon as the door was opened, Officer Igo

36

commanded both Bitter and Hornsby out of the home and onto the porch.
During oral argument in this case, the Commonwealth claimed that the
detainment was lawful because "*Michigan v. Summers*, [452 U.S. 692 (1981)] . .
. says you can detain the occupants of the residence when you're going to get a
warrant." This was an incorrect statement of both that case and the facts of
this case.

*Summers* held that "a warrant to search for contraband founded on
probable cause implicitly carries with it the limited authority to detain the
occupants of the premises while a search is being conducted." *Id.* at 705.
Stated differently, *Summers* held that police officers who *already possess a
search warrant* may detain individuals while conducting a search of a home
*pursuant to that search warrant.* As I have stated ad nauseum herein, these
officers did not have a search warrant when they went to Bitter's home.
Moreover, even if the Commonwealth's statement of the law had been correct,
its argument was based on the claim that Bitter and Hornsby were detained for
the purpose of allowing the officers to seek a search warrant. If that were true,
the officers would have sought a search warrant the moment they had Bitter
and Hornsby detained. But that is not what occurred. Instead, from the
moment Bitter and Hornsby were detained twenty minutes passed before
Officer Igo even mentioned that he was going to contact the Commonwealth's
attorney and apply for a search warrant. *Summers* accordingly provides no
justification.

I again emphasize that the items Officer Igo observed in plain sight only provided additional probable cause for him to obtain a search warrant for the dwelling, they did not provide a justification for him to enter it. And, while the officers in this case did ultimately obtain and execute a search warrant, a question that remains unanswered in this case is whether the items obtained pursuant to the search warrant should have been suppressed based on the initial unlawful entry into the home as fruit of the poisonous tree. Or, whether the evidence obtained pursuant to the search warrant could have nevertheless been admitted via application of one of the exceptions to the fruit of the poisonous tree doctrine. That doctrine "excludes both the 'primary evidence obtained as a direct result of an illegal search or seizure' and 'evidence later discovered and found to be derivative of an illegality[.]'" *Warick v. Commonwealth*, 592 S.W.3d 276, 281 (Ky. 2019) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).

I would certainly argue that Officer Igo's initial unlawful entry into Bitter's home tainted any of the evidence he saw in plain sight that was later used to obtain a search warrant, and it has long been established that probable cause cannot be established based on evidence constituting fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 484–485, (1963). Nevertheless, I acknowledge that there are three exceptions to the fruit of the poisonous tree doctrine—independent source, attenuation, and inevitable discovery—that may or may not be applicable in this case. *See Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920); *Nardone v.*

38

*United States*, 308 U.S. 338, 341 (1939)*; Nix v. Williams*, 467 U.S. 431, 444, (1984), respectively.

Were it not for Kentucky Rule of Criminal Procedure (CR) 52.04, I would strongly advocate for this Court to vacate Bitter's conviction and remand to the circuit court with orders to address the numerous consequential issues I have raised herein. As it is, CR 52.04 forbids an appellate court from reversing or remanding a final judgment based on

> the failure of the trial court to make a finding of fact on an issue essential to the judgment unless such a failure is brought to the attention of the trial court by a written request for a finding on that issue or by a motion pursuant to Rule 52.02.[10]

Bitter's counsel failed to bring these issues to the circuit court's attention but, regardless, based on the foregoing, I cannot join the Majority's opinion.

Conley, J. joins.

---

[10] CR 52.02 states: "Not later than 10 days after entry of judgment the court of its own initiative, or on the motion of a party made not later than 10 days after entry of judgment, may amend its findings or make additional findings and may amend the judgment accordingly. The motion may be made with a motion for a new trial pursuant to Rule 59."

COUNSEL FOR APPELLANT:

Jennifer Wade
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Thomas Van De Rostyne
Assistant Attorney General

Courtney J. Hightower
Assistant Attorney General